Ella S. PORTER, Plaintiff,

v.

Dr. David MATHEWS, Individually and in
his capacity as Secretary of the United
States Department of Health, Education
and Welfare, et al., Defendants.

Civ. A. No. CA75–G–2038–S.

United States District Court,
N. D. Alabama, S. D.

Sept. 7, 1976.

William M. Dawson, Jr., Dawson, Critten-
den & Still, Birmingham, Ala., for plaintiff.

Wayman G. Sherrer, U. S. Atty., Henry I.
Frohsin, First Asst. U. S. Atty., Birming-

ham, Ala., for federal defendants Matthews, Forbus, Listerman and Bruce.

## MEMORANDUM OPINION

GUIN, District Judge.

This action was brought by Mrs. Ella Porter, a nonprobationary federal employee, pursuant to 5 U.S.C.A. 702, 704, to review her thirty-day suspension without pay from the Social Security Administration's Southeastern Program Center in Birmingham, Alabama. The plaintiff has exhausted all of her administrative remedies, both within the Social Security Administration (certified record, Tab 20) and within the Civil Service Commission (C.R., Tab 19).

In such an administrative appeal, this court's scope of review is clear, but very limited. It is limited by 5 U.S.C.A. 706. That section provides, in regard to this court's scope of review:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

The district court's scope of review under this section has been considered many times. The United States Court of Appeals for the Third Circuit, after considering many cases which discussed the question, summarized the cases and the law in the case of *Charlton v. United States,* 412 F.2d 390, 395 (3d Cir. 1969):

In summary, we are of the opinion that the scope of judicial review of a federal agency's action with respect to the dismissal or discipline of a civil service employee extends to the determination whether procedural requirements have been satisfied in the administrative proceedings, and whether the administrative record establishes that substantial evidence supports the agency's action and that it was not arbitrary, capricious or an abuse of discretion.

In accordance with that rule, this court's review in this case will be limited to a consideration of (1) whether procedural requirements have been satisfied in the administrative proceedings, (2) whether the administrative record shows substantial evidence to support the suspension without pay, and (3) whether the suspension was arbitrary, capricious, or an abuse of discretion.

After a thorough review of the administrative record, this court is convinced that there is substantial evidence to support the adverse action taken against the plaintiff and equally convinced that the action was not arbitrary, capricious, or an abuse of discretion. This is the court's opinion, although if this court were considering the evidence de novo it quite possibly would make a different decision from that made by the agency.

The evidence in the record shows that Mrs. Porter wrote a letter dated February

20, 1975, (C.R., Tab 1) which was distributed to fellow employees at the Southeastern Program Center. The letter made an appeal for funds on behalf of Don Jolly, a former employee who had been terminated from the Center. The letter made accusations that Jolly had been separated because he had "uncovered the despicable AMWAY operation in the Southeastern Program Center in 1971." The references were to an alleged "pyramid sales scheme" which was allegedly headed by Mr. Thomas Bruce, Assistant Director of Management at the Center, and Mr. E. J. Listerman, Regional Representative of the Bureau of Retirement and Survivors Insurance. The letter spoke of "the terrible vindictiveness displayed by E. J. Listerman in the termination action," and of Listerman's "unlimited supply of taxpayer dollars" available to work against Jolly. It spoke of Listerman's "efforts to cover his tracks in the deceitful mission he set about to carry out against Don Jolly," and of "the tyranny of certain bureaucratic 'heads' who abuse the power of their positions," and it referred to Jolly as having been "dehumanized" by Listerman.

The record shows that as a result of the letter, management at the Center attempted on April 15, 1975, to "interview" Mrs. Porter for "information seeking" purposes (C.R., Tab 5). This meeting broke down over disagreement as to whether Mrs. Porter's attorney could tape record the interview. The interview was rescheduled and then conducted on April 17, 1975, and Mrs. Porter's attorney was again present. This interview was recorded by a court reporter and the transcript appears in the record (C.R., Tab 7).

The transcript shows that at the interview Mr. Bruce and Mr. George F. Sedberry, another management official at the Center, attempted to have Mrs. Porter state whether she had any basis for the charges made in the letter, which she admitted having written and circulated. The following exchange is typical of the interview proceedings:

MR. DAWSON: (Mrs. Porter's attorney) One other thing. We would like to cite for the record, a case with which you are familiar involving a Wayne T. Kennedy, who was fired in Chicago for, apparently, exercising his constitutional right on freedom of speech and criticizing some policies where he worked for the Federal government and I think we are all familiar with the fact that he has been vindicated throughout in that and that we see, apparently, from what we can tell and what will be discussed here today, describing similarities between his case and Mrs. Porter's.

MR. BRUCE: Well, we are familiar with the Kennedy case and we do not see that the changes of concept that Mr. Sedberry explained on the right of free speech and not absolute right and that employees do have a responsibility for their publications. They can't—our right of speech is not an unrestrained right.

MR. DAWSON: We don't take that position.

MR. BRUCE: Then this is what we are trying to deal with today. The material that has been published in this letter, has very definitely adversely affected this office in the various ways I have previously explained and the only way this can be dealt with is for Mrs. Porter to explain what she meant by these statements and what the basis of her statements are. So this is the question I would like to ask.

Do you intend to explain to us the basis for these statements contained in this letter that you have acknowledged that is yours, in response to our questions and explain the basis for these statements in order to proceed with this interview?

MR. DAWSON: We would state that in light of what is—the history of the statements and this connection with Amway Distributorships throughout this branch of the Federal government, that I think it's pretty clear what the basis of these claims would be. Whether they are right or wrong, I don't know. If there is something that specifically is erroneous here, we would appreciate that being pointed out.

MR. BRUCE: All right. Then I would like to call your attention to the second paragraph of this letter. If I interpret Mrs. Porter's comments in the second paragraph correctly, she is stating that Mr. Listerman terminated Mr. Jolly from his job because Mr. Jolly uncovered the despicable Amway operation.

Now, is that a correct interpretation of this statement, Mrs. Porter?

MRS. WALDROP: (Mrs. Waldrop was Mrs. Porter's "personal representative".) That is Mrs. Porter's opinion.

MR. BRUCE: Well, it stated as a fact. Is that a correct statement, Mrs. Porter?

MRS. WALDROP: That is Mrs. Porter's opinion.

MR. BRUCE: Then it is correct that that's your opinion. Now, I would like to ask her what is the basis for this statement.

MR. DAWSON: The basis of that would be that while she could not purport to know everything, that some of her superiors might have done, it is her position that she is entitled to an opinion as anybody else and to express that opinion.

MR. BRUCE: Mrs. Porter, do you know it to be a fact that Mr. Listerman terminated Mr. Jolly from Federal service?

MRS. WALDROP: That is Mrs. Porter's opinion.

MR. BRUCE: Okay.

MR. DAWSON: We want the record to reflect that Mr. Jolly was, apparently, terminated and apparently, Mr. Listerman did have some supervisory control over him. And that is reasonable to assume some connection there, in light of all the past dealings involved here.

MR. BRUCE: Mrs. Porter, have you been provided any information by Mr. Jolly or anyone else related to his termination, explaining the basis for his termination?

MRS. WALDROP: No, she hasn't.

MR. BRUCE: Have you seen the letter of proposal containing the conditions against Mr. Jolly, Mrs. Porter?

MRS. WALDROP: I showed it to Mrs. Porter.

MR. BRUCE: So you have, then, seen the letter of charges?

MRS. WALDROP: Yes, I have.

MR. BRUCE: No. I am talking to Mrs. Porter.

MRS. WALDROP: Yes, she has.

MR. BRUCE: Mrs. Porter, is there anything in the letter of charges related to termination of Mr. Jolly's employment because of any involvement with Amway in the involvement of any officials in this office?

MRS. WALDROP: Mr. Dawson wants to see the letter.

MR. BRUCE: All right. At this time, I would like to make the—just one minute. (Whereupon, an off the record discussion was had.)

Mrs. Porter provided almost no information as to any basis she might have had for the rather serious charges she had made in the letter. Mainly, she relied on a right to her own opinion.

On May 16, 1975, Mrs. Porter was officially notified by a letter from Mr. James Cannon, her supervisor, of a proposed suspension for a period of thirty days (C.R., Tab 11). The letter specified two charges against Mrs. Porter:

1. Writing letters to employees communicating false information which injured the reputation of management officials, lowered employee confidence in the integrity of the organization and adversely affected the efficiency of the office.

2. Failure to cooperate with management.

The letter adequately detailed the nature of these charges. (The "failure to cooperate" charge grew out of Mrs. Porter's unresponsiveness at the interviews on April 15 and 17, 1975.) Mrs. Porter was informed of her right to respond to these charges within fifteen days; she did so respond (C.R., Tab 12).

Mrs. Porter's response was again primarily that she relied on her right to free

speech: "I stand on my right as a citizen to speak or write on my own time that which I feel to be the truth . . . The matters complained of in Mr. Cannon's letter are my opinions, opinions which I have a constitutional right to express."

On June 5, 1975, Mrs. Porter was officially informed by letter from Mr. Hunter L. Keller, Director of Operations at the Southeastern Program Center (C.R., Tab 13), that she was being suspended for thirty days, beginning June 9, 1975. Mr. Keller stated in the letter that Mrs. Porter's written answer had been considered, but then stated:

. . . I do not feel, however, that the information you provided is sufficient to overcome the evidence upon which the proposal was based. I find, therefore that the suspension as proposed is fully supported by evidence and is warranted.

. . .

■ This court, having very carefully reviewed the entire administrative record in this case, concludes that the decision to suspend the plaintiff is supported by substantial evidence and was not arbitrary, capricious, or an abuse of discretion. *Charlton v. United States, supra.* Having so determined, the court must now consider whether procedural requirements have been satisfied in the administrative proceedings. A necessary element of such consideration is a determination of whether the procedural requirements, if met, are "contrary to constitutional right." 5 U.S.C.A. 706(2)(B).

After reviewing the record, the court concludes that the procedural requirements were adequately explained to Mrs. Porter and that they were properly followed by the agency. But did the procedures by which Mrs. Porter was suspended for thirty days without pay meet the constitutional requirements of due process?

The procedures for suspension were as follows:

1. Mrs. Porter was notified by letter from her group manager of the proposal to suspend her (C.R., Tab 11).

2. That letter informed her of (a) a right to make a written reply within fifteen days to the proposal; (b) a right to submit affidavits in support of the reply; (c) a right to select a representative to assist in preparing the reply; (d) a right to official time for both herself and the representative for preparation of the reply; (e) a right to review the evidence to be used in support of the proposal. The letter also informed her that consideration would be given to a request for an extension of time for reply.

3. Mrs. Porter made a written reply, addressed to Mr. Hunter L. Keller, Director of Operations at the Center.

4. Mrs. Porter received on June 5, 1975, a letter from Mr. Keller notifying her of the decision to suspend her.

5. Mr. Keller's letter informed her of a right under Article 27 of the "Master Agreement" (between the Bureau of Retirement and Survivors Insurance of the Social Security Administration and the National Office of the American Federation of Government Employees, AFL–CIO) to file a grievance and to request the local union to submit the grievance to arbitration under the procedures of Article 29. This Master Agreement was entered pursuant to Executive Order 11491. (Mrs. Porter did ask the Local to request arbitration, but no such request was made by Local officials.)

6. Mr. Keller's letter further informed the plaintiff that if no request for arbitration was made by the Local, then she could, within ten days, request an administrative review by the Bureau of Retirement and Survivors Insurance. Such a request was made, but on review the suspension was upheld. (C.R., Tab 20).

7. Mr. Keller's letter also informed Mrs. Porter of her right under 5 C.F.R. 752, Subpart C (Civil Service Regulations) to an appeal. She was informed that such an appeal must be in writing and must be submitted within fifteen days after the effective date of the suspension. Again, such an appeal was taken, but the Federal Employee Appeals Authority also upheld the suspension (C.R., Tab 19).

Do those procedures meet due process requirements? The plaintiff complains in

this court that she never got a "hearing" at any stage of the administrative proceedings, although she and her lawyer sought one and insisted it was necessary for any suspension to be legal.

The plaintiff's property rights in employment are derived from the Lloyd-LaFollette Act, 5 U.S.C.A. 7501. That Act provides in Section 7501(a) that "An individual in the competitive service may be removed or suspended without pay only for such cause as will promote the efficiency of the service." The Act also provides in 7501(b) a method by which removal or suspension can be effected:

An individual in the competitive service whose removal or suspension without pay is sought is entitled to reasons in writing and to—

(1) notice of the action sought and of any charges preferred against him;

(2) a copy of the charges;

(3) a reasonable time for filing a written answer to the charges, with affidavits; and

(4) a written decision on the answer at the earliest practicable date.

Examination of witnesses, trial, or hearing is not required but may be provided in the discretion of the individual directing the removal or suspension without pay. Copies of the charges, the notice of hearing, the answer, the reasons for and the order of removal or suspension without pay, and also the reasons for reduction in grade or pay, shall be made a part of the records of the employing agency, and, on request, shall be furnished to the individual affected and to the Civil Service Commission.

Thus, in the Act which gives a Federal employee a property interest in his job, Congress declared that no "hearing" was required for a removal or suspension without pay. In the case of *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), the Supreme Court considered this section of the Act when answering the question whether a nonprobationary federal employee was entitled to a trial-type hearing *prior to dismissal*. The precise question

presented in the present case apparently has not been considered.

In the *Arnett* case a nonprobationary federal employee, Kennedy, was removed pursuant to 5 U.S.C.A. 7501 for, *inter alia*, charges that he had publicly stated, "without any proof whatsoever and in reckless disregard of the actual facts" known to him or reasonably discoverable by him, that a superior in the Office of Economic Opportunity had attempted to bribe a representative of a community action organization. In his dismissal Kennedy was afforded the same pre-dismissal rights that Mrs. Porter was given. 416 U.S. 137, 94 S.Ct. 1636, 40 L.Ed.2d 24. Kennedy's rights under the Act were enlarged by the applicable Civil Service Commission regulations, which entitled him to an evidentiary trial-type hearing at the appeal stage. 416 U.S. 145, 94 S.Ct. 1640, 40 L.Ed.2d 28. However, Mrs. Porter, in accordance with Civil Service Commission regulations, 5 C.F.R. 752, Subpart C, was not afforded a post-suspension hearing.

In *Arnett*, a three-judge plurality of the Supreme Court expressed the view that the Lloyd-LaFollette Act, in granting discretion to have a hearing or not to have a hearing, was constitutional. Two concurring Justices felt that while a hearing was constitutionally required, the proceedings were rendered constitutional by the regulation which provided a post-termination hearing. However, as this court reads the four opinions in *Arnett*, three members of the Supreme Court felt no hearing was constitutionally required and six (two concurring Justices and four dissenting Justices) felt some hearing was required, either before or after dismissal.

■ Therefore, if Mrs. Porter's case were one of *dismissal* from employment, this court could easily say that when she was denied a hearing either before *or* after the action her constitutional right to due process was violated. But what about a denial of a hearing in a case of *suspension* for thirty days without pay? This court concludes that no trial-type hearing is constitutionally mandated in such a case.

In reaching this conclusion the court has been aware of those cases which might seem to dictate a contrary decision. For example, the court has considered carefully the case of *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), and *Wheeler v. Montgomery*, 397 U.S. 280, 90 S.Ct. 1026, 25 L.Ed.2d 307 (1970). In *Goldberg*, Mr. Justice Brennan, writing for a divided Supreme Court, held that before public assistance could be terminated the recipient must be afforded a pre-termination evidentiary hearing with the right to state his position orally and to confront and cross-examine witnesses relied on by the government. *Wheeler* was a companion case with a similar holding, also written by Mr. Justice Brennan. In each case Chief Justice Burger and Justices Black and Stewart dissented.

The *Goldberg* case dealt specifically with the questions of the recipients' due process right to a *pre*-termination evidentiary hearing. The regulations involved in that case afforded such a hearing *after* termination.

In *Goldberg*, Justice Brennan applied the test previously formulated by the Supreme Court for determining due process rights:

. . . the extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be "condemned to suffer grievous loss." *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 168, 71 S.Ct. 624 [647], 95 L.Ed. 817 [852] (1951) (Frankfurter, J., concurring), and depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication. Accordingly, as we said in *Cafeteria & Restaurant Workers Union[, etc.] v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743 [1748–1749], 6 L.Ed.2d 1230 [1236] (1961), "consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental

action." See also *Hannah v. Larche*, 363 U.S. 420, 440, 442, 80 S.Ct. 1502 [1513, 1514], 4 L.Ed.2d 1307 [1320, 1321] (1960). 397 U.S. 262, 263, 90 S.Ct. 1017, 25 L.Ed.2d 296.

While the court in *Goldberg* stated that ". . . of course, that some governmental benefits may be administratively terminated without affording the recipient a pre-termination evidentiary hearing," 397 U.S. 254, 263, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287, 296, application of the test prescribed in *Cafeteria & Restaurant Workers Union* required such a hearing for termination of welfare benefits.

However, the "private interests" which weighed so heavily in the recipient's favor, according to *Goldberg*, arose primarily out of the ordinary recipient's presumed poverty:

". . . Thus the crucial factor in this context—a factor not present in the case of the blacklisted government contractor, the discharged government employee, the taxpayer denied a tax exemption, or virtually anyone else whose governmental entitlements are ended—is that termination of aid pending resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he waits. Since he lacks independent resources, his situation becomes immediately desperate. His need to concentrate upon finding the means for daily subsistence, in turn, adversely affects his ability to seek redress from the welfare bureaucracy."

397 U.S. 254, 264, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287, 297.

The court in *Goldberg* also found important "governmental interests" to be promoted by affording welfare recipients a pre-termination evidentiary hearing. These private and governmental interests weighing in the recipient's favor were found to outweigh the "countervailing governmental interests in conserving fiscal and administrative resources." 397 U.S. 254, 265, 266, 90 S.Ct. 1011, 1019, 25 L.Ed.2d 287, 297, 298.

In finding the pre-termination administrative procedures inadequate, in that they

provided only for the recipient to make a written response to the proposed administrative action, the court emphasized that most welfare recipients "lack the educational attainment necessary to write effectively and . . . cannot obtain professional assistance," 397 U.S. 254, 269, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287, 299.

All those factors may be real enough to adequately support the result in *Goldberg*, and *Wheeler*. But those factors are not present in Mrs. Porter's case.

First, in the present case, it cannot be assumed that federal employees suspended without pay for thirty days or less are going to be deprived of a means of support. The means of support is merely interrupted temporarily. Neither can the court assume that such employees would be driven by economic hardship to abandon the administrative appeals process. In the present case, the employee's private interest is not in keeping a means of support, but in keeping it without interruption.

Second, the governmental interests here are very different. Instead of "conserving fiscal and administrative resources," the agency here is attempting to discipline an employee for improper activity and thereby to improve the efficiency of the service.

■ This court is convinced that the agency's interest in disciplining employees so as to improve, or maintain, efficiency is stronger than the private interest of Mrs. Porter in not having her earnings temporarily halted. Further, the governmental interest is so much stronger that this court feels the requirements of due process were met in Mrs. Porter's case when she was afforded the opportunity to file a pre-suspension answer, assistance in preparing that answer, and an administrative appeal. Due process requirements were met without a pre- or post-suspension trial-type hearing. Certainly, a trial-type hearing is not always a requisite of due process, and due process requirements vary with time, place, and circumstances. See *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951);

*Cafeteria and Restaurant Workers Union v. McElroy*, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). See also, *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), wherein the Supreme Court, although holding that due process in the context of parole revocation includes a trial-type hearing, stated:

. . . It has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands.

408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484, 494.

The court is also familiar with the case of *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). That case held that a public school student being suspended for ten days or less was entitled to notice of the charges against him and a "rudimentary" hearing, but not necessarily to a hearing with counsel or at which he could call witnesses or confront and cross-examine witnesses supporting the charge. This court feels that Mrs. Porter's thirty-day suspension without pay was no more serious than a student's ten-day suspension from school (considering that a student may require a much longer time to make up the ten-day loss, especially if a semester's work is lost on account of it). Even considering *Goss*, this court feels the procedures available to Mrs. Porter were constitutionally adequate.

■ In summary, 5 U.S.C.A. 7501 and the Civil Service Commission regulations issued pursuant thereto are not constitutionally deficient for failure to provide for a trial-type hearing prior to a thirty-day disciplinary suspension without pay.

■ This court has also considered the "free speech" issue presented, but concludes that in light of *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), the agency action was not improper as an infringement on Mrs. Porter's right to free speech.

The plaintiff has sued two officials of her union local and asks for money damages for their alleged breach of their duty of fair representation. Specifically, she contends that defendants Heflin and Canter wrongfully consulted with management concerning the problem with Mrs. Porter and then later wrongfully refused to request arbitration of her grievance. This amounts to a suit pursuant to Section 301 of the Labor-Management Relations Act (29 U.S.C. § 185) for violation of the statutory duty of fair representation, National Labor Relations Act Sec. 8(b) (29 U.S.C. § 158(b)). Since the court has found the agency did not act capriciously, arbitrarily or unfairly in suspending the plaintiff, the court must find that the union local did not act unfairly, capriciously or arbitrarily either. The only breach by the union officials would have been in failing to ask for arbitration of Mrs. Porter's grievance, but under the circumstances such failure was completely reasonable. The Supreme Court has said:

A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith. . . .

Vaca v. Sipes, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967). This court has found in the record no evidence whatever of "arbitrary," "discriminatory" or "bad faith" action on the part of the union toward Mrs. Porter.

For the reasons hereinabove set out, judgment will be entered for the defendants.